UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

In re JOSEPH J. O'HARA,

                                    Debtor.                    1:11-CV-0807 (LEK)

_____

CLARE BRONFMAN and SARA
BRONFMAN; and DOUGLAS
WOLINSKI, Chapter 7 trustee, as
intervenor,

                                    Plaintiffs,

            -against-

JOSEPH J. O'HARA,

                                    Defendant.

_____

**MEMORANDUM-DECISION and ORDER**

**I.      INTRODUCTION**

        On July 14, 2011, Appellant Joseph J. O'Hara ("Appellant") filed a Notice of Appeal from

an Order of the Honorable Robert E. Littlefield, Jr., Chief U.S. Bankruptcy Judge, on April 18,

2011, granting Appellees Clare Bronfman and Sara Bronfman's (collectively "Appellees") Motion

for summary judgment denying Chapter 7 discharge.  Dkt. No. 1.  For the following reasons, the

decision of the bankruptcy court is affirmed.

**II.     BACKGROUND**

        **A.  Bankruptcy Proceeding**

        Appellant filed a voluntary Petition for relief under Chapter 7 of the Bankruptcy Code on

June 30, 2008.  Dkt. Nos. 7-1, 7-2.  Appellant listed real estate assets of over $1,700,000 and

personal property of over $60,000 with the value of several items to be determined.  Dkt. No. 7-1 at

5, 8.  Appellant scheduled unsecured debt of $5,641,868, unsecured priority debt of approximately $50,000, and secured debt of $2,253,658.  Id. at 14-22.  Appellees are both listed on Schedule F of the bankruptcy petition as creditors holding unsecured claims in the amount of $1,250,000 each in connection with a settlement agreement.  Id. at 19-20.  Appellees commenced an adversary proceeding on May 26, 2009, objecting to the discharge of Appellant on the grounds of 11 U.S.C. § 727(a)(2), (3), (4), and (6).  Dkt. Nos. 1 at 2; 6-6 at 2.

Both parties moved for summary judgment.[1]  Dkt. No. 1 at 6-7; see Dkt. Nos. 3-2; 4-2.  Judge Littlefield issued an oral decision on June 30, 2010, denying both parties' motions with respect to § 727(a)(2), (4), and (6) causes of action based on questions of fact surrounding intent.  Dkt. No. 13-1 at 4-5, 20; see also Bronfman v. O'Hara (In re O'Hara), No. 09-90055, 2011 WL 1467927, at*1 (Bankr. N.D.N.Y. Apr. 18, 2011).[2]  As to § 727(a)(3), Judge Littlefield directed the parties to file additional memoranda of law and adjourned the motions for a subsequent oral decision.  See Dkt.No. 13-1.  On July 16, 2010, Judge Littlefield orally granted Appellees' motions with respect to 11 U.S.C. § 727(a)(3) and denied Appellant's motion.  In re O'Hara, 2011 WL 1467927, at *1.  A written decision followed on April 18, 2011.  Id.  Appellant filed a notice of appeal on July 14, 2011.[3]  See Dkt. No. 1.

---

[1] Appellant's Motion for summary judgment did not contain a statement of material facts.  See Dkt. No. 4-2.  The bankruptcy court could have dismissed the Motion on that ground but chose not to.  Bronfman v. O'Hara (In re O'Hara), No. 09-90055, 2011 WL 1467927, at *10 n.7 (Bankr. N.D.N.Y. Apr. 18, 2011).

[2] The decision of the bankruptcy court appears in the record at Docket Number 6-6.

[3] Appellant's statement of the issues on appeal is different from that listed in Appellant's brief.  Compare Dkt. No. 1 at 4-5, with Dkt. No. 18 at 6-7.  One issue not addressed in the brief is whether the Complaint should have been dismissed for insufficient service.  The defenses of insufficient process and insufficient service of process are deemed waived if not made in a motion

### B. Factual History

Appellant is an attorney admitted to practice in Washington, D.C.  Dkt. No. 2-4 at 1.  He has a B.A. in economics from the College of the Holy Cross, an M.P.A. from Cornell University's Graduate School of Business and Public Administration, and a J.D. from Cornell Law School.  Dkt. No. 9-9 at 16.  According to Appellant's resume, he has owned or operated numerous business enterprises and charitable organizations.  Id. at 14-16.  These include being president of at least three different management consulting firms since 2000 where he was "[r]esponsible for monitoring all of the projects that were undertaken" by the companies, as well as being "responsible for the development of new business."  Id. at 14.  These firms provided services to government agencies, including state, county, and school districts "throughout the country."  Id.  The services provided to government agencies included financial consulting.  Id.  Since 1979, Appellant has owned or operated twenty-four different entities.  Dkt. Nos. 9-9 at 20-21; 9-10 at 1.  Appellant also owned an interest in a real estate development company that had plans to develop a vineyard and hotel.  Dkt. No. 12-4 at 19-20.

Appellant has owned and operated at least two multi-million-dollar operations.  One, Strategic Governmental Solutions, Inc. ("SGS"), filed for bankruptcy in April 2008 with listed assets of $54.48 and liabilities of $14,093,166.96.  Dkt. No. 14-1 at 22.  The other, Educational Services & Products, LLC ("ESP"), also filed for bankruptcy in April 2008 with listed assets of $31,571,921.50 and liabilities of $13,611,680.68.  Dkt. No. 14-2 at 12.  At the time of filing, ESP

---

to dismiss prior to an answer or raised as an affirmative defense in the answer.  FED. R. CIV. P. 12(b)(4)-(5), (h)(1); see FED. R. BANKR. P. 7012(b) (incorporating by reference FED. R. CIV. P. 12(b) through (h)).  Appellant filed an Answer to the Complaint without raising any affirmative defenses.  Dkt. No. 2-4.  Therefore, Appellant waived the defenses for insufficient process and insufficient service of process.

had monthly income and expenses of $250,000 and $200,000, respectively. Id. at 40-41.

In March 2000, Appellant founded SGS. Dkt. No. 9-10 at 1. From 2003 to 2006, SGS developed the Student Tracking and Reporting System ("STARS") for the El Paso Independent School District to assist public schools in the collection of federal reimbursements. In re O'Hara, 2011 WL 1467927, at *4; Dkt. Nos. 5-5 at 14; 9-5 at 1. SGS developed this software at a cost of approximately $2,700,000, and SGS was the sole owner of the STARS program. Dkt. Nos. 5-4 at 8; 9-5 at 1. Appellant tried to market this software for SGS by employing the services of Administrative & Financial Services, Inc. ("AFS"), another business entity founded by Appellant. Dkt. No. 5-4 at 5. SGS transferred the software to AFS, and it was booked as a million-dollar asset. Dkt. Nos. 5-5 at 15; 12-5 at 18. Liabilities of $1,000,000, including a $250,000 shareholder loan, were also recorded in the tax return for AFS for calendar year 2006. Dkt. No. 12-5 at 18. Marketing efforts failed, and at some point prior to 2008, either AFS, SGS, or both transferred the STARS software to Professional Assistance & Support Services, LLC ("PASS"). See Dkt. Nos. 5-4 at 8; 5-5 at 15. PASS was established by Appellant to "isolate the [STARS] software." Dkt. No. 12-4 at 8. PASS is not wholly owned by Appellant, who has a 25 to 30% interest in the company. Dkt. No. 7-1 at 11. See also Adv. Pro. Case No. 09-90056, Dkt. No. 17-3 at 2. According to Appellant, he was also "the only individual who had ever invested any money in PASS." Dkt. No. 9-5 at 2. PASS's obligation to SGS was later transferred from SGS to ESP. Dkt. No. 9-5 at 1. Appellant does not wholly own ESP. Dkt. No. 7-1 at 11.

In an attachment to Appellant's Schedule B of his voluntary petition, Appellant lists ownership interests in the following entities: 50% ownership interest in ESP; 30% ownership interest in PASS; 100% ownership interest in Properties Development & Management, Inc.; 100%

4

ownership interest in SGS; 100% ownership interest in The O'Hara Group & Associates, Inc.; 100% ownership interest in The O'Hara Group & Associates, PLLC. Dkt. No. 7-1 at 11. Each of these interests were listed as a value of "TBD." Id. at 7, 11. Appellant indicated in his Petition that he was unable "to access all of [his] financial records and/or tax returns for the time periods in question." Id. at 39. In response to numerous questions in the Statement of Financial Affairs ("SOFA"), Appellant stated that the information requested in the forms would be provided because he lacked sufficient access to his records. Id. at 28-29, 31-33, 35-36, 39-40; Dkt. No. 7-2 at 12-13, 16-18. When Appellant amended his schedules and SOFA, a few of his responses to these questions were changed to "Indeterminate" or "None." Dkt. No. 7-6 at 2, 9, 11, 13.

Prior to the commencement of this adversarial proceeding, Respondents had obtained a series of orders pursuant to Federal Rule of Bankruptcy Procedure 2004 on September 11, 2008. Dkt. Nos. 7-3, 7-4, 7-5. These three orders permitted Appellees and the Trustee to subpoena documents and conduct examinations of Appellant and third parties to ascertain the state of Appellant's financial affairs and material business transactions.[4] Id. While Appellees attempted to

---

[4] The Appellees specifically requested from Appellant:
copies of the Debtor's tax returns from 2002 through 2007; a copy of the Debtor's insurance policy (homeowner's or renter's); a copy of the Debtor's divorce decrees and/or divorce settlements which were entered between 2002 and 2008; copies of the Debtor's paychecks from January 1, 2008 to current date; a copy of the Debtor's Last Will and Testament . . . ; copies of business documents (to include documents concerning the formation, ownership and purpose of businesses) and banking records from 2002 to the current date for the Debtor and the following businesses: Ideal Systems and Solution, LLC, the Institute for Health and Human Services, Inc., the Ethical Foundation, Administrative and Financial Services, Inc., O'Hara Web Services, Service Center, Inc., IHHS, Inc., Professional Assistance and Support Services, Strategic Government Solutions, The O'Hara Group and Associates, Inc., The O'Hara Group and Associates, PLLC, The O'Hara Group and Associates, LLC, Properties Development and Management, Inc., Professional Assistance & Support Services, Inc., Strategic Government Solutions, Inc., Educational Services Products, LLC and ESP Acquisitions,

collect the requested information from Appellant and others, Appellees and the Trustee had to seek

several extensions of time to object to Appellant's discharge.  See Bankr. Case No. 08-12108, Dkt.

Nos. 39; 52; 64; 108; 109; 112.  Appellees allege that they filed the objection despite Appellant

having not fully complied with the bankruptcy court's orders for discovery.  Dkt. No. 4-5 at 3-4.

Appellees served discovery requests in the context of the adversarial proceeding on or about March

3, 2010.  Dkt. No. 8-10.  Appellant did not timely respond to the discovery demands.[5]

In an affidavit by Appellant, Appellant stated that he has "continuously acted as the

Managing Partner and Chair of the Board of Directors for PASS since its inception."  Dkt. No. 9-5

at 1.  "A subsequent accounting transaction reflected in the financial records of PASS and SGS

---

Inc. and/or ESP Acquisition LLC; records and/or banking/financial documents regarding
the 2006 and 2007 transfers of funds borrowed from Properties Development
Management, the real estate and/or closing documents concerning the real property
listed on Schedule A of the Debtor's petition; documents regarding the loan transactions
with Properties Development Management; copies of real estate documents concerning
the transfer of all real estate owned by the Debtor and/or companies owned by him . .
. for the past six years; a copy of the Citizens Bank, Bank of America, Adirondack Trust,
Mercantile Bank and M&T Bank accounts from 2002 to current date owned by the
Debtor and/or his businesses; a copy of the SEFCU account from May 2008 to current;
copies of the life insurance policies listed on Schedule B; copies and/or statements on
the retirement account listed on Schedule B; documents and/or statements concerning
the Debtor's interest in the business he owned or substantially controlled as listed on
Schedule B; documents and/or statements concerning the investments listed on Schedule
B; a copy of the foreclosure action commenced against the Debtor; a copy of the
documents and title concerning the transfer of the 2005 Mitsubishi to Ramona Soppe
and/or any other third party; a copy of the agreement with Shady Harbor Marina and
copies of the documents including titles, financing agreements, etc. regarding the boat
listed on Schedule B; documents relating the incomplete Schedules and Statement of
Financial Affairs; and any other document relied upon by the Debtor in preparing his
Schedules and Statements of Financial Affairs . . . .

Dkt. No. 7-3 (footnote omitted).

  [5] The Court takes judicial notice, as the bankruptcy court did below, that several conferences
concerning Appellant's compliance with discovery were held in the adversarial proceeding.  See In
re O'Hara, 2011 WL 1467927, at *6; see also Dkt. Nos. 10-5; 10-6; 10-8; 10-12; 11-1; 11-2; 11-3.

transferred the STARS software to PASS.  To [Appellant's] knowledge, there was no written

assignment executed for this transfer."  Id.  "In conjunction with the accounting transaction that

transferred the STARS software to PASS from SGS, PASS was to pay SGS a percentage of all fees

that it earned in all future sales of the STARS software."  Id.  Appellant also stated that as of July 1,

2007, "SGS' assets were transferred to Educational Services & Products, LLC."  Id.  Further,

"PASS' obligation to SGS was assigned to ESP."  Id.  Appellees alleged that "no records have been

produced to [Appellees] consistent therewith."  Dkt. No. 104 at 11-12.  However, a balance sheet

from January 31, 2008, has ESP holding the note for the STARS program in the amount of

$750,000.[6]  Dkt. No. 5-12, Vol. 16, File No. 920.  Appellees further alleged that Appellant "has

produced to the [Appellees] no documents regarding PASS let alone the assignment."  Id. at 12.

Appellant made various admissions as to his lack of records, including the following in a February

2, 2009, deposition:

> [Mr. Savino]: Who owned the software prior to the transfer to PASS?
> [Appellant]: And I'm saying it's either SGS or ESP. I don't know the time frame when
> that occurred.
> [Mr. Savino]: Okay.
> [Appellant]: If I was—if it was prior to July 1st of '07 it would have been SGS; if it was
> July 1st forward, July 1st '07 forward, it would have been ESP.
> [Mr. Savino]: Do you have any records that would evidence the ownership of the
> software?
> [Appellant]: I don't have any—there's a lot of records I don't have for a lot of the
> businesses.

Dkt. No. 12-4 at 11.  Further, Appellant states in his Motion: "Could the transactions have been

better memorialized?  Perhaps the debtor should have signed a series of documents back and forth

between his wholly controlled companies . . . ."  Dkt. No. 5-4 at 8-9.  Appellant does not maintain

---

[6] This record is not mentioned in any of Appellant's briefs or motions.

segregated business records for each of his separate entities.  Dkt. No. 9-4 at 28-29.  Further, PASS

is not wholly owned or controlled by Appellant.  Dkt. No. 7-1 at 11; Adv. Pro. Case No. 09-90056,

Dkt. No. 17-3 at 2.

      Appellant's accountant disagrees with Appellant as to which entity owned the STARS

software prior to 2008, the year Appellant's bankruptcy petition was filed.  According to

Appellant's accountant as well as the tax records of PASS, PASS had assets at that time of only

$36,304, consisting of cash and receivables.  Dkt. No. 104-6 at 11.  Additionally, according to the

accountant and the tax records for AFS, AFS owned the STARS software in 2006 as well as

liabilities in the full amount of the value of the software, including a $750,000 liability owed to SGS

and a $250,000 shareholder loan.  Dkt. No. 12-5 at 1.  Appellees have provided the corporate book

for AFS, which "reflected no by-laws, no minutes, no organizational documents and only blank,

unissued stock certificates and blank, uncompleted stock transfer ledger."  Dkt. No. 12-1 at 17.

Appellant's accountant was not aware whether the STARS program was ever transferred out of

AFS.  Dkt. No. 12-5 at 3.  Further, Appellant's accountant stated that he had seen an approximately

ten-page-long document detailing this "complex transaction," but again this was not provided to the

Appellees.  Dkt. No. 12-5 at 2, 5, 7.  Appellant produced the records maintained by his accountant

only after the Appellees had subpoenaed the records of the accountant and made a copy of his hard

drive.  Dkt. Nos. 4-2 at 4; 5-5 at 5-7.  Other parties, including twenty-one banks and financial

institutions used by Appellant, did not provide records until a subpoena was issued.  Dkt. No. 5-5 at

7-10.  Appellant stated on July 13, 2010, that he requested that each of those entities also provide

him with a copy of any documents sent to Appellees, so that he could forward those copies to

Appellees to satisfy the Rule 2004 orders from September 2008 and the discovery requests from

March 2010.  Id. at 9.

Further, Appellant has admitted that "[t]here were lots of documents that I don't have copies of any longer," having lost track of "variety of records" after moving out of his former girlfriend's house.  Dkt. Nos. 4-4 at 2; 9-6 at 7-10.  When Appellant was asked what documents were not returned to him, Appellant responded that he did not recall.  Dkt. No. 9-6 at 8-9.  Further, his former girlfriend stated that there are no documents for Appellant at her house and that he removed all of those documents.  Dkt. No. 9-6 at 15-17.  Appellant also stated that he no longer had access to PASS documents when ESP's computers were sold with the business.  Dkt. Nos. 4-4 at 2; 9-7 at 9.  However, he never made or requested copies of these documents prior to the sale.  Dkt. No. 9-7 at 9.  Appellant also was using a new laptop that he obtained in 2008.  Dkt. No. 9-6 at 11-13.  Appellant stated he had not transferred any files onto it, and he did not know what happened to the information contained on his previous laptop.  Id.

Appellant refused to answer questions posed by Appellees' counsel about certain documents that he may have authored:

> Q.   I'm handing you Exhibit 5, and do you see what purports to be an e-mail address
>       for yourself?
> A.   Yes.
> Q.   And was that, in fact, your e-mail address as of the date indicated?
> A.   I'm not answering any questions concerning the document.
> Q.   Are you taking the Fifth Amendment?
> A.   I'm not answering any questions.
>                *       *       *
> Q.   Tell me.
> A.   I'm not going to tell you.
>                *       *       *
> Q.   Did you send this e-mail, which is Exhibit 5?
> A.   Let me take the words one at a time.  I'm not going to answer any questions
>       about that document.  Are there any of those that you don't understand?

See Dkt. No. 9-8 at 23-27.  Appellant also invoked the Fifth Amendment and refused to disclose any

information regarding his Neteller[7] account:

> Q.      . . . Would you agree with me that a portion of the money you borrowed from the
>         [Appellees] was used in 2004 to pay your balance or at least a part thereof at an
>         offshore web-based gambling business?
> A.      I have been instructed not to answer any of these questions.
>                 *       *       *
> Q.      Mr. O'Hara, would you agree with me that roughly $150,000 of the money
>         borrowed from the [Appellees] transferred in transfers of roughly $99,000 and
>         $51,000 respectively were moved from your personal account after the first of
>         your Bronfman borrowings to the Ethical Foundation to replace monies that had
>         moved from the Ethical Foundation, in part, to an office [sic] shore gambling
>         business called Net Teller?
> [Appellant's counsel].       Objection.
> Q.      You are going to reserve the right to be [sic] Fifth Amendment?
> [Appellant's counsel].       Exactly.

Dkt. No. 9-9 at 9-11.

    Appellant claims that since 2002, he has relied upon his accountant, James Loperfido, to

preserve his personal and business-related financial records.  Dkt. No. 5-5 at 2-3.  Appellant's

accountant had "installed various versions of QuickBooks software on a server in [Appellant's]

office—and, thereafter, [would access] the *information that had been entered into that system by

[Appellant's] staff* via remote access and flash-key downloads."  Dkt. No. 5-9 at 3 (emphasis

added).  Appellant indicated that his accountant would send him drafts of documents, which

Appellant would mark up and send back by email or facsimile.  Dkt. No. 9-6 at 13.  According to

Appellant, the server that had all of the QuickBooks records in his office was moved by the

purchasers of the assets of ESP.  Dkt. No. 5-5 at 4.  Appellant states that he was unable to access the

---

    [7] "Neteller is an online payment service that is frequented by internet gambling business and
patrons.  Neteller, amongst other services, allows for businesses outside of the United States to
access the funds of people that reside within the United States."  In re O'Hara, 2011 WL 1467927,
at *7; see also Dkt. No. 9-10 at 15-20.

information that was stored on it.  Id.

Although Appellant provided an additional nine or ten boxes in or about late May 2010, this was approximately a month after Appellees' motions for summary judgment were filed, and Appellant was unable to identify what was in the boxes.  Dkt. Nos. 11-8 at 27-30; 11-9 at 1-3. Further, Appellant was still responding to Appellees' discovery requests at his continued deposition on June 17, 2010.  Dkt. No. 11-9 at 1.

## III.  STANDARD OF REVIEW

A district court reviews a bankruptcy court's conclusions of fact for clear error and its conclusions of law *de novo*.  Yarinsky v. Saratoga Springs Plastic Surgery, 310 B.R. 493, 498 (N.D.N.Y. 2004) (citing In re Manville Forest Prods. Corp., 209 F.3d 125, 128 (2d Cir. 2000)); In re Petition of Bd. of Dirs. of Hopewell Int'l Inst. Ltd., 275 B.R. 699, 703 (Bankr. S.D.N.Y. 2002); FED. R. BANKR. P. 8013.  Mixed questions of law and fact are reviewed *de novo*.  Deep v. Danaher, 393 B.R. 51, 54 (N.D.N.Y. 2008) (Kahn, J.) (citing Capital Commc'ns Fed. Credit Union v. Broodrow, 126 F.3d 43, 47 (2d Cir. 1997)).  Further, "[w]here the appellant challenges a grant of summary judgment, the appellate court reviews the lower court's ruling *de novo* because the determination that there are no genuine issues of material fact is a legal conclusion."  Jacobowitz v. Cadle Co. (In re Jacobowitz), 309 B.R. 429, 435 (S.D.N.Y. 2004) (citing FDIC v. Giammettei, 34 F.3d 51, 54-55 (2d Cir. 1994)).  Therefore, a court reviews a bankruptcy court's grant of summary judgment *de novo*.  See Schackner v. Breslin Realty Dev. Corp., No. 11-CV-2734, 2012 WL 32624, at *3 (E.D.N.Y. Jan. 5, 2012).  "[T]he district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  FED. R. BANKR. P. 8013.

11

## IV.    DISCUSSION

### A.  Discharge and § 727

Discharge in bankruptcy is a privilege and not a right, which "should only inure to the honest debtor." In re Juzwiak, 89 F.3d 424, 427 (7th Cir. 1996) (citing In re Fromman, 153 B.R. 113, 116 (Bankr. E.D.N.Y. 1993); In re Pimpinella, 133 B.R. 695, 697 (Bankr. E.D.N.Y. 1991); In re Morando, 116 B.R. 14, 15 (Bankr. D. Mass. 1990)); see also Cohen v. De La Cruz, 523 U.S. 213, 217 (1998) (stating that the basic policy of the bankruptcy code is to provide relief only to the "honest but unfortunate debtor").

Section 727(a)(3) provides that a debtor will not be denied a discharge unless:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).  "[T]he purpose of § 727(a)(3) is to make discharge dependent on the debtor's true presentation of his financial affairs." Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re Caneva), 550 F.3d 755, 761 (9th Cir. 2008).  "The disclosure requirement removes the risk to creditors of 'the withholding or concealment of assets by the bankrupt under cover of a chaotic or incomplete set of books or records.'" Id. (quoting Burchett v. Myers, 202 F.2d 920, 926 (9th Cir. 1953)).  The language of § 727(a)(3) requires more than just the preservation of business records; it "places an affirmative duty on the debtor to create books and records accurately documenting his business affairs." Peterson v. Scott (In re Scott), 172 F.3d 959, 969 (7th Cir. 1999) (citing In re Juzwiak, 89 F.3d at 429); see also Barristers Abstract Corp. v. Caulfield (In re Caulfield), 192 B.R. 808, 823 (Bankr. E.D.N.Y. 1996) ("[D]ebtors have a duty to preserve those records that others in

like circumstances would ordinarily keep.").

"Section 727(a)(3) requires as a precondition to discharge that debtors produce records which provide creditors 'with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present.'" In re Juzwiak, 89 F.3d at 427 (quoting In re Martin, 141 B.R. 986, 995 (Bankr. N.D. Ill. 1992)). A plaintiff bears the burden of proof as to the inadequacy of a debtor's "records to ascertain his financial condition and business transactions." In re Nemes, 323 B.R. 316, 325 (Bankr. E.D.N.Y. 2005). To satisfy this burden, a plaintiff must show "(1) that the debtor failed to keep or preserve adequate records; and (2) 'that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions.'" Jacobowitz, 309 B.R. at 436 (quoting Meridian Bank v. Alten, 958 F.2d 1226, 1232 (3d Cir. 1992)). However, this impossibility element does not require that the creditors examine all records and documents produced and prove that the debtor's financial condition cannot be ascertained from those records. See Strzesynski v. Devaul (In re Devaul), 318 B.R. 824, 831 (Bankr. N.D. Ohio 2004).

Rather, the focus is on the documents that have not been provided by the debtor and whether it would be unduly burdensome or impossible to ascertain the debtor's financial condition or material business transactions without them. Casa Invs. Co. v. Brenes (In re Brenes), 261 B.R. 322, 330 (Bankr. D. Conn. 2001) (quoting In re Wolfson, 139 B.R. 279, 286 (Bankr S.D.N.Y. 1993)); see also D.A.N. Joint Venture v. Cacioli (In re Cacioli), 463 F.3d 229, 235 (2d Cir. 2006) (citing White v. Schoenfeld, 117 F.2d 131, 132 (2d Cir. 1941)) (stating that the statute only requires the "creditor to show that the debtor failed to keep and preserve any books or records from which the debtor's financial condition or business transactions might be ascertained"). To require otherwise would

13

"place an improperly high initial burden on creditors." <u>Strzesynski</u>, 318 B.R. at 831.  Further, the debtor is the gatekeeper of this information and the "[c]ourts and creditors should not be required to speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs."  <u>In re Juzwiak</u>, 89 F.3d at 427; <u>see also</u> <u>O'Connell v. DeMartino (In re DeMartino)</u>, 448 B.R. 122, 131 (Bankr. E.D.N.Y. 2011) ("[T]he successful administration of the Bankruptcy Code hinges on a debtor's veracity and his willingness to make full disclosure.").  It is not a necessary element of § 727(a)(3) to prove intent on the part of the debtor in failing to maintain or provide adequate records.  <u>In re Jacobowitz</u>, 309 B.R. at 440.

Further, a debtor cannot satisfy his burden of maintaining and producing adequate records by pointing the creditor to where records can be obtained from third parties.  <u>See id.</u> at 438.  In determining whether the creditor has met his burden of proof, the determination is not whether the creditor "could have obtained from other sources some or all of the records necessary to reconstruct the debtor's history.  Instead, the question is whether the [creditor] demonstrated a prima facie case that debtor's financial history could not be constructed from the records *provided by the debtor*."  <u>Wazeter v. Michigan Nat'l Bank (In re Wazeter)</u>, 209 B.R. 222, 229 (Bankr. W.D. Mich. 1997) (emphasis added).  In determining whether the records are adequate, courts consider several factors, including:

> 1. Whether a debtor was engaged in business and, if so, the complexity and volume of the business;
> 2. The amount of the debtor's obligations;
> 3. Whether the debtor's failure to keep or preserve books and records was due to the debtor's fault;
> 4. The debtor's education, business experience and sophistication;
> 5. The customary business practices for record keeping in the debtor's type of business;
> 6. The degree of accuracy disclosed by the debtor's existing books and records;
> 7. The extent of any egregious conduct on the debtor's part; and

14

8. The debtor's courtroom demeanor.

State Bank of Indiana v. Sethi (In re Sethi), 250 B.R. 831, 838 (Bankr. E.D.N.Y. 2000) (citation

omitted).  "A sophisticated debtor is generally held to a higher level of accountability in record

keeping, and the more complex the debtor's financial situation, the more numerous and detailed the

debtor's financial records should be."  Id. at 839 (citations omitted).  When making the

determination as to whether the debtor has kept sufficient records, "the court must conduct a case-

by-case analysis, and the sufficiency of a debtor's record keeping is a matter of judicial discretion."

Geltzer v. Cohen (In re Cohen), No. 01-93570, 2007 WL 710199, at *5 (Bankr. S.D.N.Y. Mar. 6,

2007) (citing Adams v. Joseph (In re Joseph), No. 91-CV-1114, 1992 WL 96324, at *3 (N.D.N.Y.

Apr. 22, 1992)).

If the creditors meet their initial burden of proving an absence of records, then the burden

shifts to the debtor to either rebut the proof of insufficient records, or to justify the failure to

maintain and produce adequate records.  Ochs v. Nemes (In re Nemes), 323 B.R. 316, 325 (Bankr.

E.D.N.Y. 2005).  Whether the failure to maintain and produce records under § 727(a)(3) is justified

is "'a question in each instance of reasonableness in the particular circumstances.'"  In re Cacioli,

463 F.3d at 235 (quoting In re Underhill, 82 F.2d at 259-60).  The factors considered in determining

whether the debtor is justified are: "the education, experience, and sophistication of the debtor; the

volume of the debtor's business; the complexity of the debtor's business; the amount of credit

extended to debtor in his business; and any other circumstances that should be considered in the

interest of justice."  In re Cacioli, 463 F.3d at 237 (quoting Meridian Bank, 958 F.2d at 1231).

"[T]he debtor's honest belief that he does not need to keep the records in question, or that his

records are sufficient, or his statement that it is not his practice to keep additional records, does not

15

constitute justification for failure to keep or preserve records under § 727(a)(3)." State Bank of Indiana, 250 B.R. at 839.

Section 727 "imposes an extreme penalty for wrongdoing." In re Chalasani, 92 F.3d 1300, 1310 (2d Cir. 1996). Therefore, the exceptions to discharge are to be construed strictly against the creditor and liberally in favor of the debtor. Id. However, "[i]n reviewing an objection to a discharge based on the debtor's failure to keep books or records from which the debtor's financial condition may be ascertained, the court must be mindful of the debtor's obligation in a bankruptcy case to reveal, rather than conceal, the complete financial picture." State Bank of Indiana, 250 B.R. at 838. Further, "[a]lthough courts are often not inclined to grant summary judgment on objections to discharge, 'summary judgment is not per se improper in a § 727 proceeding.'" Schackner v. Breslin Realty Dev. Corp., No. 11-CV-2734, 2012 WL 32624, at *4 (E.D.N.Y. Jan. 5, 2012) (quoting Wazeter v. Mich. Nat'l Bank (In re Wazeter), 209 B.R. 222, 227 (W.D.Mich. 1997)).

### B. Analysis

Appellant is a sophisticated business person. He holds two advanced degrees from an Ivy League school, including a law degree. Appellant founded, owned, or operated two dozen separate business entities. Further, he owned and operated at least two different multi-million-dollar business entities, SGS and ESP. His entities marketed their services nationally, providing consulting services to state and county governments and school districts. Appellant was contemplating developing property into a hotel and a vineyard. He has listed assets that exceed $1,700,000 and liabilities in excess of $7,500,000 million. Due to his experience, Appellant is held to a much higher standard than an unsophisticated wage earner and is expected to have maintained a greater number of and more detailed financial records than the average wage earner. See State Bank

16

of Indiana, 250 B.R. at 839.

Like Appellant, the debtor in Caneva also owned or controlled numerous business entities. 550 F.3d at 762. The Caneva debtor argued that "because many of his business entities were holding companies or did not conduct business operations, records for them may not exist." Id. Like Appellant, the Caneva debtor asked the plaintiff, the bankruptcy court, and the district court in that case

> to disregard the affirmative duty that § 727(a)(3) imposes on a debtor to keep and preserve records, take him at his word that he has no records because there was nothing to record, and focus instead on what might be learned from the boxes of records he did keep and eventually offered to the bankruptcy court. In other words, he says that if there is a needle in this haystack, it is up to the court to find it.

Id. The district court held that "when a debtor owns and controls numerous business entities and engages in substantial financial transactions, the complete absence of recorded information related to those entities and transactions establishes a prima facie violation of 11 U.S.C. § 727(a)(3)." Id.

Just as the debtor in Caneva failed to provide financial records on his entities, Appellant has failed to provide the financial records of AFS or PASS[8] or even the identity of the entity that owned AFS prior to its dissolution. Further, Appellant has not produced underlying financial documents for many of his other entities. Throughout the depositions of Appellant, he often answered Appellees' questions by saying that documents exist to answer the questions and that the documents will speak for themselves. See Dkt. Nos. 9-4 at 25-29; 9-5 at 9-11. However, due to the failure of Appellant to produce these records, Appellees were forced to subpoena and obtain the records from third parties, including Appellant's accountant. Dkt. Nos. 4-2 at 4; 5-5 at 5-7.

---

[8] Appellant has provided only the 2006 tax return for AFS and 2007 tax return for PASS, without any underlying financial records. Further, this tax return contradicts Appellant's deposition testimony and affidavits as to which entity owned the STARS program prior to 2007.

The transfers of the STARS program, which has, or at least had, a valuation of one million dollars, among Appellant's various business entities constitute material business transactions, especially when the STARS program ended up owned by an entity not wholly owned by Appellant. Dkt. Nos. 5-5 at 15; 7-7 at 11; 12-5 at 18.  The transfers occurred less than two years prior to the 2008 bankruptcy filing.

Based on the records obtained from Appellant's accountant, the transfers consisted of first moving STARS from SGS to AFS, which is shown in the 2006 tax return for AFS.  Based on this 2006 tax return for AFS, AFS had liabilities of $1,000,000, which consisted of a $250,0000 shareholder loan and a loan for $750,000.  Based on SGS's balance sheets, SGS was owed $750,000 for a note arising from STARS.

SGS then assigned its interest in the $750,000 note to ESP based on a balance sheet from 2008 for ESP.  AFS was dissolved at some point during this process and PASS, an entity not wholly owned by Appellant, allegedly ended up with the software.  According to Appellant, this occurred in 2007; however, the tax records of PASS show no such asset being owned by PASS for that year. Other than the records mentioned above, there is nothing to document these transfers.

The murkiness of these transactions makes it very difficult to ascertain Appellant's financial condition.  Appellant's accountant stated that only debits and credits within a company must match. There are no documents to clear away this shroud of mystery because neither Appellant nor his accountant remember the details of these transactions.  Appellant's accountant was not even aware that the STARS program had ever been taken out of AFS and that AFS had been dissolved.  Dkt. No. 12-5 at 4.

Appellant has produced numerous documents to Appellees including over 1,200 separate

files on 17 compact discs from the hard drive of the Appellant's accountant.  See Dkt. No. 5-12.

However, the quality, rather than the quantity, of records dictates whether Appellant has produced

adequate records to warrant discharge.  Schechter v. Hansen (In re Hansen), 325 B.R. 746, 762

(Bankr. N.D. Ill. 2005).  Appellant claims the records were sufficient for his business entities that

filed for bankruptcy and therefore should also be sufficient for an individual debtor.  Dkt. No. 18 at

4-5.  Discharge does not apply to companies filing for bankruptcy.  11 U.S.C. § 727(a)(1).

Therefore, whether a debtor has "failed to keep or preserve any recorded information . . . from

which the debtor's financial condition or business transactions might be ascertained" and is thereby

barred from discharge is an inquiry undertaken only for individuals.  See 11 U.S.C. § 727(a)(1), (3).

Discharge is reserved for individuals because an individual debtor will survive liquidation in

bankruptcy and may still retain property, while a business entity does not survive liquidation.  See

64 AM. JUR. PROOF OF FACTS 3d 113, § 5 (2001).  Therefore, the records' adequacy for filing

previous bankruptcies of debtor's entities does not establish their adequacy here in the context of an

individual debtor's bankruptcy.

        In raising an objection to discharge, Appellees proffered the depositions and affidavits of

Appellant and Appellant's accountant, as well as the tax returns of AFS and PASS.  Based upon: (1)

Appellant's advanced degrees, including a law degree;[9] (2) the sophistication of Appellant's

business experience; (3) the complexity of the transactions that Appellant and his entities undertook

both with the STARS transaction as well as in its main business of providing consulting services to

government agencies; (4) the marketing of Appellant's services nationally; (5) the amount of assets

---

        [9] Appellant contends he has not practiced law since 2004.  See Dkt. No. 18 at 8.  His legal
education nevertheless contributes to his sophistication as a businessperson.

and liabilities involved; and (6) the records both provided and not, Appellees have met their burden

of proof as to Appellant's failure to keep and maintain adequate records under § 727(a)(3).  The

burden then shifts to Appellant to either rebut Appellees' claim of inadequate records or to provide a

justification for his failure to maintain and produce adequate records.  Ochs, 323 B.R. at 325

(quoting Thaler, 197 B.R. at 29).

Neither Appellant's Brief nor the Motion for summary judgment filings point to specific

documents that answer the inadequacy of Appellant's records raised by Appellees.  See generally

Dkt. Nos. 4-2; 4-6; 5-4; 18.  Appellant makes only conclusory statements that the records are

sufficient.  See Dkt. Nos. 4-6 at 8; 5-4 at 2-3, 9; 18 at 3, 5, 12-13, 17-18.  For example, Appellant

claims "[t]he Bankruptcy Judge has merely accepted the unspotted allegations of [Appellees]

without examining the evidence."  Dkt. No. 18 at 18.  However, Appellant provided no evidence to

refute the claims of Appellees regarding the lack of records for: (1) the entity that owns the STARS

program and its transactions,[10] including a $250,000 shareholder loan; (2) whether Appellant is

owed a receivable from PASS or AFS, (3) AFS's operations and financial records; (4) the entity that

owned AFS and the entity it was dissolved into; (5) inter-company transactions between business

entities he owned and controlled; and (6) Appellant's Neteller account.  Dkt. No. 6-6 at 10-11; Dkt.

No. 12-1 at 2, 11, 14, 18-19.

Like the defendant in Caneva, Appellant has "simply parrot[ed] back in his affidavit the text

---

[10] Appellant mentioned Appellees' claim of inadequacy for the STAR transactions in his
Supplemental Brief regarding the Motion for summary judgment, but provided no records of the
transaction.  Dkt. No. 5-4 at 2.  Rather, Appellant points to the settlement of an adversary
proceeding as sufficient to relieve him from his duty to keep or preserve records.  Dkt. No. 5-4 at 3.
Even if the resolution of the entity that owns the STARS program were sufficient to meet the burden
for debtor's financial condition, it would still fail to meet the duty to preserve records "from which
the debtor's . . . business transactions might be ascertained."  See 11 U.S.C. § 727(a)(3).

of Section 727(a)(3), conclusorily denying its elements." <u>Caneva</u>, 550 F.3d at 760 (internal

quotation marks omitted).  As in <u>Caneva</u>, this is not sufficient to rebut the Appellees' case of

inadequate records.  <u>Id.</u> at 759-60; <u>see also</u> <u>Razzaboni v. Schifano (In re Schifano)</u>, 378 F.3d 60, 66

(1st Cir. 2004) ("The non-moving party must show more than conclusory allegations, improbable

inferences, or unsupported speculation to establish genuine issues of material fact.  Competent

evidence is required."); <u>Kulak v. City of New York (In re Kulak)</u>, 88 F.3d 63, 71 (2d Cir. 1996)

("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not

defeat summary judgment.").  Likewise, Appellant has not justified his failure to maintain and

produce adequate records.[11]  <u>See generally</u> Dkt. No. 18.

     Finally, Appellant's argument that "[w]hether the keeping of records in an electronic format

which is maintained by a CPA as opposed to paper books represents a failure to maintain records"

was not addressed by the bankruptcy court and thus will not be addressed here.  Dkt. No. 18 at 6;

<u>see</u> <u>Reserve Capital Corp. v. Levine</u>, No. 05-CV-00743, 2007 WL 329179, at * 2 (N.D.N.Y. Jan. 30,

2007) (Kahn, J.) ("[T]he general rule is that an appellate court will not consider an issue not passed

upon below unless failure to entertain the issue will result in a manifest injustice.").  The Court

finds that no injustice would result from declining to address the issue of the proper format of the

records because the records here were not properly kept or preserved regardless of their format.

Dkt. No. 18 at 2, 10-11.  What is at issue is not the type or class of documents, but rather the

---

[11] As in <u>Marrama v. Citizens Bank</u>, the Court makes its findings on grounds other than any
adverse inference that can be drawn from Appellant's assertion of his Fifth Amendment privilege.
Although this adverse inference clearly can be drawn by the bankruptcy court at trial, the Court
expresses "doubt as to whether a court can draw the same inference at the summary judgment stage,
where all reasonable inferences must be drawn for the non-movant." <u>Marrama v. Citizens Bank (In
re Marrama)</u>, 445 F.3d 518, 522 (1st Cir. 2006) (citations omitted).

transactions that are still shrouded in mystery due to a lack of records detailing them.  <u>Id.</u>

**V.      CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that Appellant's Appeal (Dkt. No. 1) is **DENIED** and **DISMISSED**; and it is

further

**ORDERED**, that the April 18, 2011, Decision and Order of the Bankruptcy Court granting

Appellees' Motions for summary judgment denying Appellant's discharge is **AFFIRMED**; and it is

further

**ORDERED**, that the Clerk of the Court serve copies of this Memorandum-Decision and

Order upon the parties to this action in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:      April 23, 2013
            Albany, NY



Lawrence E. Kahn
U.S. District Judge